**Electronically Filed
Supreme Court
SCAP-23-0000088
30-SEP-2025
03:57 PM
Dkt. 39 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Plaintiff-Appellee,

vs.

BERNARD BROWN,
Defendant-Appellant.

SCAP-23-0000088

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CAAP-23-0000088; CASE NO. 2CPC-20-0000652)

SEPTEMBER 30, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA AND DEVENS, JJ.

OPINION OF THE COURT BY DEVENS, J.

## I.  INTRODUCTION

Defendant-Appellant Bernard Brown (Brown) appeals his 2022 conviction for murder in the second degree of his former girlfriend Moreira Monsalve (Monsalve) following a jury trial in

the Circuit Court of the Second Circuit (circuit court).[1]  Brown maintained that he last saw Monsalve on the night of January 12, 2014, when she kissed him good night and left his apartment between 10:00 and 10:30 p.m.  Brown claimed that Monsalve's son had picked her up.  Her son denied that ever happened.  And Monsalve was never seen again.

On appeal, Brown raises several points of error, including: the sufficiency of the evidence to sustain his conviction; evidentiary suppression issues relating to Brown's interview with Maui Police Department (MPD) Detectives Wendell Loo (Loo) and David Lee (Lee) and the prosecutor's use of a subpoena to obtain Brown's customer account subscriber name from Hawaiian Telcom; prosecutorial misconduct during closing argument; plain error by the trial court in not giving a unanimity or a lesser included offenses jury instruction and with respect to deficient charging language in Brown's 2020 indictment; prejudice to his due process rights from pre-indictment delay; and trial court error in the circuit court's denial of his motion to dismiss the 2020 indictment on procedural and sufficiency of evidence grounds.

After careful review of the record and giving due consideration of the issues and arguments presented, we hold

---

[1]    The Honorable Peter T. Cahill presided.

that there was sufficient evidence to sustain Brown's conviction; that the circuit court did not err in admitting into evidence Brown's statement to police and his subscriber name; and that Brown's claims of prosecutorial misconduct, plain error relating to jury instructions, alleged defects in the indictment, and pre-indictment prejudice were, on this record, not established.

## II. PROCEDURAL BACKGROUND

### A. Circuit Court Proceedings

#### 1. 2019 Indictment and Dismissal Without Prejudice

On September 20, 2019, Brown was indicted by a Maui grand jury for murder in the second degree of Monsalve. Four witnesses testified before the grand jury: Monsalve's adult daughter and MPD Detectives Oran Satterfield, Nelson Hamilton, and Matthew Bigoss.

On July 19, 2020, Brown filed a motion to dismiss the indictment pursuant to Rule 47 of the Hawai'i Rules of Penal Procedure (HRPP). Brown raised three grounds for dismissal: insufficient evidence to support the indictment; violation of his right to a fair grand jury proceeding due to a grand juror's conflict of interest or failure to provide a limiting instruction or prejudicial statement by independent grand jury counsel; and denial of his right to a fair trial due to the excessive use of hearsay evidence. The prosecution opposed Brown's motion.

3

On December 7, 2020, the circuit court granted Brown's motion to dismiss without prejudice, but did not specify the grounds for the dismissal.

### 2. 2020 Indictment

Eleven days after the circuit court dismissed the first indictment, a second grand jury was convened. The same four witnesses testified.[2]

Of note, Detective Satterfield testified as to what Brown told initial MPD investigators, Detectives Loo and Lee, during Brown's interview at the Wailuku police station that took place several hours after Monsalve was reported missing on January 14, 2014. According to Detective Satterfield, Brown had answered the detectives' questions, describing, among other things: the up-and-down nature of his dating relationship with Monsalve; how Monsalve and her youngest son primarily lived at Brown's apartment for two years; the difficulties they experienced in their relationship; that Brown had asked Monsalve and her son to move out, ending their relationship New Years Day of 2014; that Brown had not physically abused Monsalve; and that Brown was to fly to California on January 14, 2014 but changed his flight after Monsalve had not come over to watch his cat. Detective

---

[2] The record indicates that MPD Detective Nelson Hamilton was Lieutenant Hamilton when appearing before the second grand jury.

4

Satterfield further testified about Brown informing the detectives that Monsalve came over to his apartment on January 12, 2014 at around 5:00 p.m., after which they hung out and watched a movie; and later, as Brown fell asleep on the couch, Monsalve kissed him on the cheek, saying her son would pick her up, and left his apartment between 10:00 and 10:30 p.m.

On December 18, 2020, the grand jury indicted Brown for murder in the second degree.

### 3. Brown's Motion to Dismiss the Indictment

Brown filed a motion to dismiss the second indictment, raising similar grounds asserted in his first motion, including insufficiency of the evidence, denial of his right to a fair trial due to two jurors' conflicts of interest, and excessive use of hearsay evidence by detectives testifying in lieu of the witnesses who would be called at trial.

In opposing the motion, the prosecution countered that the grand jury evidence was sufficient to sustain the indictment; the purported conflicts of interest provided no grounds to allege bias; and hearsay evidence was not deliberately used in place of better evidence to improve the prosecution's case for indictment.

After a hearing, the circuit court denied Brown's motion to dismiss the indictment. The court found there was probable cause to indict Brown; no evidence the two grand jurors Brown

5

disputed were biased; and Brown did not establish the deliberate use of hearsay in place of better evidence.

### 4. Evidentiary Motions

#### a. Motion to Suppress Brown's Hawaiian Telcom Subscriber Name and Information

Brown filed a motion to suppress information produced in response to a June 18, 2014 subpoena the prosecution served on Brown's internet service provider (ISP), Hawaiian Telcom, requesting basic information on the subscriber account to which Internet Protocol (IP) number 72.253.119.239 had been assigned between January 1 and March 31, 2014. Hawaiian Telcom responded to the subpoena and disclosed that IP number 72.253.119.239 (Brown's IP address or the subject IP address) had been assigned to Brown's residential subscriber account, and also disclosed a telephone number, Brown's name as the subscriber, the subscriber's address in Wailuku, and the account's activation date.

Brown contended that the subpoenaed information constituted a warrantless search. Citing to State v. Walton, 133 Hawaiʻi 66, 324 P.3d 876 (2014), Brown argued that he had a legitimate expectation of privacy in this basic information, including his name, even if it had been previously revealed to a third-party, i.e., Hawaiian Telcom. Brown asserted that MPD's use of this information "was significant because MPD was able to take a

logging of different IP addresses from Ms. Monsalve's accounts to determine where a device was when it was being accessed." In other words, the relevance of this information, according to Brown, was that it allowed MPD to determine the location of Monsalve and/or her phone during certain relevant time periods. Thus, he maintained, the subpoenaed account information from Hawaiian Telcom should be suppressed as a warrantless and unlawful search and seizure.

The prosecution countered that under Walton, Brown was still required to demonstrate that he had a legitimate expectation of privacy in the subscriber information he provided to the third-party, Hawaiian Telcom, including an actual subjective expectation of privacy in the subject information, and that defendant's expectation was one that society acknowledged as reasonable. Prosecutors asserted that Brown had not factually established a subjective expectation of privacy in the information disclosed by Hawaiian Telcom. Further, the prosecution noted that Brown had voluntarily disclosed his IP address through emailing others and accessing different websites, which logged his IP address.

Following a hearing, the circuit court suppressed Brown's Hawaiian Telcom customer account address, telephone number, and service activation date, but allowed into evidence Brown's full

name on the customer account.[3]

**b.    Motion in Limine to Exclude Brown's January 14, 2014 Interview with MPD**

Brown filed a motion in limine to exclude the statements he gave during a January 14, 2014 interview with MPD Detectives Loo and Lee.  Brown asserted that the interview violated his constitutional rights because he was subjected to a custodial interrogation without being given a <u>Miranda</u> warning.

Following a hearing, the circuit court denied Brown's motion, concluding Brown was not in custody during the January 14, 2014 police interview.

**5.    Trial**

**a.    Prosecution's Case in Chief**

The prosecution presented a no-corpse, circumstantial evidence case with thirty-five witnesses testifying.  Evidence was presented regarding Monsalve's sudden and complete disappearance in support of a reasonable inference that she was deceased, and Brown's activity and behavior to show that Brown was conscious of having caused her disappearance.  Witnesses included Monsalve's adult daughter and youngest son, MPD investigators, FBI agents, Monsalve's coworkers and long-time friends, and individuals who had interactions with Brown after

---

[3]    This ruling and the court's reasoning for the partial suppression of information does not appear to have been memorialized in a written order.

Monsalve was reported missing.

The prosecution's witnesses testified to Monsalve's prior lifestyle and habits. They described her close relationship with her daughter and son; her dedication and reliability at her job as a financial analyst for a military contractor; and the uncharacteristic way she did not call to let colleagues know why she was not at work on January 13 and 14, 2014 (Monday and Tuesday). Monsalve's son described his mother as "always put[ting] others, her friends and her family and her kids, before herself." Monsalve's daughter stated that she and her mother had regularly communicated several times a week, but since January 12, 2014, she received no further communications from her mother.

Witnesses also described how Brown had Monsalve's car on January 13, 2014 and how Monsalve's purse and smashed cellphone were later found that night in a nearby park dumpster. One witness testified that Monsalve had committed to house-sit and watch a friend's pet starting Friday of that week, while that friend went on a vacation. Another witness testified that she and Monsalve discussed being "empty nesters" after both of their sons' high school graduations. Monsalve's son testified that he last saw his mother on January 12, 2014 when they went to a college admissions and financial aid counseling meeting. Witnesses also described the lack of any contact or

communication between Monsalve and her children and friends, as well as abandonment of her banking and other financial accounts for over five years between her January 2014 disappearance and Brown's trial, as uncharacteristic of her.

This evidence, the prosecution argued, indicated that Monsalve was likely deceased, as her disappearance was sudden and unplanned, inconsistent with her normal lifestyle and habits.  See State v. Torres (Torres I), 122 Hawai'i 2, 14, 222 P.3d 409, 421 (App. 2009), affirmed and corrected on other grounds by, State v. Torres (Torres II), 125 Hawai'i 382, 262 P.3d 1006 (2011).

Other prosecution witnesses offered testimony as to Brown's statements and actions in the time frame surrounding Monsalve's disappearance.  Monsalve's daughter testified that in her first phone conversation with Brown midday on January 14, 2014, Brown told her that after Monsalve dropped her daughter off at the airport on January 12, 2014, "the car started stalling out, so she went over to his house because the car was stalling out[;]" and that Monsalve's son had picked her up from there between 10:00 and 10:30 p.m.  Other witnesses testified that Brown told them that Monsalve was with him the night of January 12, 2014 before she kissed him goodnight and was picked up from his apartment by Monsalve's youngest son or someone else between 10:00 and 10:30 p.m.  Monsalve's son testified that he and his

10

mother did not make plans to pick her up the night of January 12, 2014, nor did she try to contact him that night to come and pick her up. Monsalve's daughter testified that she read a Facebook post from Brown on Monsalve's Facebook homepage, timestamped at approximately 7:00 p.m. January 12, 2014, stating he was watching her at his apartment playing the video game Candy Crush and "should be talking to her, but she's so intent on passing a Candy Crush level that he doesn't want to disturb her." Monsalve's daughter continued, stating, "he's basically saying my mom was sitting next to him on the couch."

Brown's interview with Detectives Loo and Lee was read into evidence, including Brown's statement that Monsalve spent that weekend with him. In that interview, Brown recounted that on Sunday, January 12, 2014, Monsalve arrived at around 5:00 p.m.; and later that night, as he was falling asleep on the couch, she left his apartment between 10:00 and 10:30 p.m. One of the police investigators testified that after 11:00 p.m., at least a half hour after the time Brown said he was falling asleep and Monsalve had left his place, his Facebook records showed the deletion of twenty-one Facebook friends from his account, which continued into the next morning resulting in thirty-seven more friends being deleted.

Several witnesses also described postings appearing on Craigslist starting the very next day on January 13, 2014,

advertising the sale of Brown's furniture, including a couch, which one purchaser testified smelled like chemicals, as if it were recently cleaned. One of Brown's friends in California described how on January 13, 2014, Brown had called her with some panic in his voice, asking for a "burner phone" and wondering if his phone was being tapped; this same witness testified that Brown called her weeks later, asking her how to wipe a computer hard drive. Another witness described how Brown said he needed to change a flight to California the week of Monsalve's disappearance because she was not there as previously agreed upon to watch his cat while he was away. Brown's roommate at the time described Brown taking Monsalve's vehicle on January 13, 2014 to a local mechanic. And another witness testified that Brown stated Monsalve had left her car at Brown's place because it was stalling and he was to take it to the mechanic the next morning, even though Monsalve's son testified that on January 12, 2014, the vehicle was not having any particular problems. Yet another witness testified that Brown's Dodge Nitro was "spotless" and "overly clean" when it was repossessed towards the end of January 2014.

The prosecution also presented investigator testimony about electronic data retrieved from Monsalve's damaged cellphone, which had been found abandoned in a local park's dumpster, as well as her Facebook and Microsoft Hotmail account records.

Detective Bigoss testified that Monsalve's Facebook records indicated Monsalve's phone "interacted with Facebook" from Brown's IP address at 9:08 p.m. on January 12, 2014 and then again at 1:04 a.m. on January 13, 2014. Detective Bigoss also stated that Monsalve's Facebook records showed that her account was being accessed from Brown's IP address on January 29, 2014, weeks after Monsalve's disappearance, not from Monsalve's phone, but from a device that had also been used to access Brown's Facebook account on the same day. Other activity recorded in Monsalve's cellphone browser indicated the phone was accessing numerous banking, credit card, and airline websites as well as email from 10:45 p.m. on January 12, 2014 through 3:05 a.m. the morning of January 13, 2014. And Detective Satterfield testified that in reviewing Brown's Facebook records for the time period immediately before and after January 12-13, 2014, Brown's IP address appeared in Brown's Facebook activity.

Brown's counsel preserved his objections that Brown's January 14, 2014 statement to police was unlawful for lack of a Miranda warning, and that the link between Brown's subscriber name and the subject IP address during January through March 2014 was unlawfully obtained by subpoena.

### b.    Brown's Motion for Acquittal

At the conclusion of the prosecution's case, Brown's counsel orally moved for judgment of acquittal arguing, in part,

that there was no direct evidence Ms. Monsalve was deceased or that Brown had killed her. The circuit court denied Brown's motion.

### c. Brown's Defense

With colloquy by the court, Brown elected not to testify. Brown called one witness in his defense: a person who had been hired to repossess Brown's black Dodge Nitro from the parking lot of Brown's Wailuku apartment at the end of January 2014. The witness testified on cross-examination that he had not spoken with Brown at the time of the repossession and denied previously telling police that he had.

### d. Jury Instructions

During the settling of jury instructions, Brown's counsel initially requested a unanimity jury instruction pursuant to State v. Arceo, 84 Hawai'i 1, 928 P.2d 843 (1996), and a lesser included offenses instruction, but later withdrew both proposed instructions.

### e. Closing Arguments

As is relevant to this appeal, one of the DPAs (DPA 1) gave the prosecution's closing argument, and the second DPA (DPA 2) gave rebuttal argument after Brown's closing argument.

DPA 1 noted that "we know" that "the defendant drops off [Monsalve's] car" on the evening of January 13, 2014.

DPA 2 used the phrase "we know" several times during his

rebuttal. The DPA framed Brown's activity from the night of January 12, 2014 onward as "acting guilty" and creating "false alibis." DPA 2 continued:

> First of all, [Monsalve's] phone it's at and being used at the defendant's apartment throughout the night of January 12th. On Monday morning the defendant and no one else is in a panic and, frankly, acting guilty. His actions lead to guilt.
> Also, after Tuesday, he starts to create false alibis for the police to follow, for the people who are looking for her, [Monsalve's] family and friends, and finally [Brown] killed . . . Monsalve because he felt played, cheated, and broken.
> So let's look at what the defendant said to police. So we know [Monsalve] went to his apartment on Sunday at around 5:00 p.m. and he acknowledged that she was there at least until 10:00-10:30 p.m. and this is very important. Now, [Monsalve's] phone – when the FBI did their analysis, they noted continuous browser activity from 8:30 p.m. January 12th until 3:17 a.m. January 13th, the following day.
> Now, how do we know [Monsalve's] phone is at the defendant's apartment throughout Sunday night? We know that because of the IP address and [Monsalve's] Facebook account. [Monsalve's] Facebook account shows activity on this IP address at 9:08 p.m. on Sunday night, and we know [Monsalve] was at the defendant's apartment because the defendant himself said she was there, and it shows the activity is [Monsalve's], an Android phone.
>
> . . . .
>
> Now, again, on Monday, at 1:04 a.m., the same thing happens with [Monsalve's] Facebook account. It's updated at this IP address where we know [Monsalve] is at the defendant's apartment at 1:04 a.m.
> Now, the time is in UTC time so Detective Bigoss testified that we're ten hours behind UTC time, so the time is actually 1:04 a.m. Hawaii time on Monday.
> So we know between Sunday at 9:08 p.m. there's a connection with Brown's IP address when we know she's at his apartment, and at 1:04 a.m., Monday.

(Emphasis added.)

### f.    Brown's Renewed Motion for Judgment of Acquittal, and the Jury's Verdict

At the conclusion of closing arguments, Brown renewed his

motion for judgment of acquittal, which the circuit court denied.  And on August 25, 2022, the jury returned a verdict finding Brown guilty of murder in the second degree.

### 6. Post-Verdict Motions and Sentencing

Brown filed a post-verdict motion for acquittal or, in the alternative, a new trial.  The prosecution contended there were no grounds to acquit Brown or order a new trial.  Brown's motion was denied.  Brown was sentenced to life imprisonment with the possibility of parole.  A judgment of conviction and sentence was entered on March 30, 2023.

### B. Intermediate Court of Appeals (ICA) Proceedings and Transfer Application

Brown timely appealed to the ICA and raised ten points of error in his opening brief, which we reorder and summarize briefly.  First, Brown argued the evidence adduced at trial was insufficient to support his conviction for murder in the second degree.  Second, he asserted that the trial court erred in not suppressing his January 14, 2014 interview with MPD detectives who did not give a Miranda warning and violated his constitutional rights.  Third, Brown contended that the circuit court erred in denying his motion to suppress his subscriber name from the information investigators obtained through the subpoena of Hawaiian Telcom's records, and that "[t]he statute that prosecutors relied upon to issue the subpoena compelling

Hawaiian Telcom to provide Brown's account information, Hawaiʻi Revised Statutes (HRS) § 28-2.5, contains no suspicion standard at all[,]" instead allowing a prosecutor to obtain Brown's account information in violation of his federal privacy rights and his state constitutional rights pursuant to Walton.

Fourth, Brown asserted the circuit court committed plain error as the prosecution engaged in misconduct when repeating the phrase "we know" in closing and rebuttal. Brown further contended that the circuit court committed plain error in not instructing the jury on second-degree murder's lesser included offenses and in not giving the jury a specific-act Arceo unanimity instruction. And finally, Brown argued that the circuit court erred in not dismissing the 2020 indictment because: there was a more than five-year pre-indictment delay, which substantially prejudiced his defense; the charging language lacked sufficient detail pursuant to State v. Jardine, 151 Hawaiʻi 96, 508 P.3d 1182 (2022); and there were infirmities in the 2020 grand jury proceedings, including use of excessive hearsay testimony by MPD officers "laundering" potential trial witnesses' testimony before the grand jury, as well as an alleged replaying of the same script from the 2019 grand jury case and a lack of sufficient evidence to sustain the indictment.

The prosecution's answering brief opposed all of Brown's

points of error, as will be discussed below.

On March 11, 2024, the Attorney General (AG) for the State of Hawai'i filed an amicus curiae brief pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(g).[4]  The AG noted that Brown was challenging the constitutionality of two statutes, HRS § 28-2.5 and HRS § 803-47.6, although Brown's appeal did not reference HRS § 803-47.6.[5]  Relevantly, the AG presented case law

---

[4]     HRAP Rule 28(g) provides in pertinent part: "The attorney general may file an amicus curiae brief without order of the court in all cases where the constitutionality of any statute of the State of Hawai'i is drawn into question[.]"

[5]     HRS § 803-47.6(d)(2)(D) (2014) provides:

> (2)  A provider of electronic communication service or remote computing service shall disclose a record or other information pertaining to a subscriber to, or customer of, the service (other than the contents of an electronic communication) to a governmental entity only when:
>
> . . .
>
> (D)  Presented with an administrative subpoena authorized by statute, an attorney general subpoena, or a grand jury or trial subpoena, which seeks the disclosure of information concerning electronic communication, including but not limited to the name, address, local and long distance telephone billing records, telephone number or other subscriber number or identity, and length of service of a subscriber to or customer of the service, and the types of services the subscriber or customer utilized.

HRS § 803-47.6(d)(2)(D) (emphases added).

HRS § 28-2.5 (2009) provides in relevant part:

> [T]he county prosecuting attorneys, when conducting a criminal investigation in their respective jurisdictions, may, subject to the privileges enjoyed by all witnesses in this State, subpoena witnesses, examine them under oath, and require the production of any books, papers, documents, or other objects designated therein or any other record however maintained, including those electronically stored, which are relevant or material to the investigation.

relating to digital evidence, including ISP subscriber information and addressed HRS § 803-47.6, which authorizes law enforcement to obtain subscriber or customer information such as a subscriber's name, address, telephone number, other numbers and identifiers, and the length and types of services purchased. The AG's amicus brief also addressed the impact of <u>Walton</u> on the use of subpoenas in state and county criminal investigations; and presented constitutional privacy analysis from other states, recommending a balancing test weighing an individual's right to privacy with the public's interest in lawful subpoena practice in criminal investigations and prosecutions.

On March 28, 2024, we granted Brown's application for transfer to this court, and oral argument was held on June 19, 2025.

### III. STANDARDS OF REVIEW

### A. Sufficiency of the Evidence

The sufficiency of evidence is reviewed as follows:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.
>
> "Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."

State v. Kalaola, 124 Hawaiʻi 43, 49, 237 P.3d 1109, 1115 (2010) (citations omitted).

Further, "due deference must be given to the . . . trier of fact to determine credibility, weigh the evidence, and draw justifiable inferences of fact from the evidence adduced." State v. Taliferro, 77 Hawaiʻi 196, 201, 881 P.2d 1264, 1269 (App. 1994) (citing State v. Naeole, 62 Haw. 563, 565, 617 P.2d 820, 823 (1980). On appellate review, this court gives "full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." State v. Yabusaki, 58 Haw. 404, 410, 570 P.2d 844, 848 (1977) (citations omitted).

B.    **Motion to Suppress Evidence**

> This court reviews a trial court's ruling on a motion to suppress evidence de novo:
>
> > to determine whether the ruling was "right" or "wrong." The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawaiʻi Constitution.

Walton, 133 Hawaiʻi at 83, 324 P.3d at 893 (quoting State v. Spillner, 116 Hawaiʻi 351, 357, 173 P.3d 498, 504 (2007) (citations omitted)).

20

## C. Jury Instructions

> It is the circuit court's duty and ultimate responsibility to ensure that the jury was properly instructed on issues of criminal liability. When jury instructions, or the omission thereof, are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

Walton, 133 Hawaiʻi at 83, 324 P.3d at 893 (cleaned up).

Jury instructions to which no objection was made at trial will be reviewed for plain error. State v. Ishimine, 151 Hawaiʻi 375, 378, 515 P.3d 192, 195 (2022). "Additionally, this court will apply the plain error standard of review to correct errors [that] seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." Id. at 378-79, 515 P.3d at 195-96 (quotations and citations omitted).

## D. Prosecutorial Misconduct Plain Error

When a defendant does not object to prosecutorial misconduct, this court applies a plain error review. State v. Hirata, 152 Hawaiʻi 27, 30, 520 P.3d 225, 228 (2022).

> We apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights. . . . Because prosecutorial misconduct impacts the fundamental right to a fair trial, there is no difference between the plain error and harmless beyond a reasonable doubt standards of review.

21

Id. at 30-31, 520 P.3d at 228-29 (cleaned up).

**E.    Pre-indictment Delay**

> In reviewing a constitutional due process claim of prejudice engendered by preindictment delay, the due process inquiry must consider the reasons for the delay in prosecution as well as the prejudice to the accused. Therefore, a balancing approach is applied, weighing the substantial prejudice to the defendant's right to a fair trial against the reasons for the delay.

State v. Higa, 102 Hawaiʻi 183, 186-87, 74 P.3d 6, 9 (2003) (cleaned up).

The appellate court must employ both the "clearly erroneous" and "right/wrong" tests in reviewing the circuit court's denial of a motion to dismiss for pre-indictment delay. The circuit court's findings of fact are subject to the clearly erroneous standard of review, while its conclusions of law are freely reviewable.  State v. Martinez, 101 Hawaiʻi 332, 339, 68 P.3d 606, 613 (2003) ("This court must employ both the 'clearly erroneous' and 'right/wrong' tests in reviewing the circuit court's denial of a motion to dismiss for pre-indictment delay." (citations omitted)).

> A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.

State v. Keliiheleua, 105 Hawaiʻi 174, 178-79, 95 P.3d 605, 609-10 (2004) (cleaned up).

**F.    Motion to Dismiss Indictment**

"A trial court's ruling on a motion to dismiss an

indictment is reviewed for an abuse of discretion." State v. Mendonca, 68 Haw. 280, 283, 711 P.2d 731, 734 (1985) (citation omitted).

> The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. The burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it. Dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way.

State v. Borge, 152 Hawai'i 458, 464, 526 P.3d 435, 441 (2023) (cleaned up). We apply this standard in cases involving allegations of prosecutorial abuse or misconduct before the grand jury. State v. Taylor, 126 Hawai'i 205, 214, 269 P.3d 740, 749 (2011).

When the basis of dismissal alleged is sufficiency of the evidence to sustain the indictment, a circuit court's denial of a motion to dismiss is reviewed de novo. State v. Shaw, 150 Hawai'i 56, 61, 497 P.3d 71, 76 (2021). "In reviewing the sufficiency of the evidence to establish probable cause before the grand jury, every legitimate inference that may be drawn from the evidence must be drawn in favor of the indictment and neither the trial court nor the appellate court on review may substitute its judgment as to the weight of the evidence for that of the Grand Jury." Taylor, 126 Hawai'i at 215, 269 P.3d at 750 (citation omitted).

## G.    Sufficiency of the Charge

Whether a charge sets forth all of the essential elements of a charged offense, is a question of law that we review de novo under a right/wrong standard.  Jardine, 151 Hawai'i at 100, 508 P.3d at 1185.

### IV.   DISCUSSION

## A.    Evidence adduced at trial, viewed in the strongest light for the prosecution, was sufficient to support the jury's verdict.

Brown challenges the sufficiency of the evidence supporting his second-degree murder conviction, arguing that the evidence presented was insufficient to establish "what offense, if any, he had committed that resulted in Monsalve's disappearance."  He concedes that the prosecution's evidence "reasonably supports inferring that Brown did something violent to cause Monsalve's disappearance."  However, he maintains that "it does not reasonably support drawing any further downstream inferences about what he did, much less whether what he did was a fatal voluntary act or non-fatal one that, coupled with not rendering or seeking aid, became fatal."  Brown further asserts the evidence does not reasonably support inferences about Brown's state of mind.

The prosecution contends there was sufficient evidence to establish murder in the second degree.  Similar to the no-corpse murder case, Torres I, the prosecution asserts that the jury

24

could infer from the presented evidence that Monsalve's total absence after the night of January 12, 2014 and the subsequent and complete lack of contact or transactions to the present meant she was deceased. Further, the prosecution argues that Brown, who told several witnesses that Monsalve was with him at his apartment before she vanished, thereafter behaved in a manner supporting a reasonable inference he had intentionally or knowingly caused Monsalve's death.

Our case law maintains that in the absence of a murder victim's body, circumstantial evidence can be sufficient to support a finding of guilt beyond a reasonable doubt. See Territory v. Duvauchelle, 28 Haw. 350, 366-67 (1925) ("Although the dead body has not been found, and although no witness swore that he saw the perpetration of the murder, yet the circumstances extrinsic to the confession, and established by other evidence, are so strong that they cannot fail to satisfy any unbiased mind that the accused is guilty of the crime of which he has been convicted.").

The Torres I opinion provides a framework to analyze circumstantial evidence used to prove beyond a reasonable doubt that a victim's sudden or seemingly unplanned disappearance did not comport with their lifestyle and habits, leading to the conclusion that they were deceased; and that the defendant's statements, conduct, and other evidence can establish beyond a

25

reasonable doubt that the defendant had acted with the requisite state of mind to cause the victim's death.  122 Hawai'i at 14, 222 P.3d at 421; State v. Batson, 73 Haw. 236, 254, 831 P.2d 924, 934 (1992) ("Given the difficulty of proving the requisite state of mind by direct evidence in criminal cases, we have consistently held that . . . proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the [defendant's conduct] is sufficient . . . . Thus, the mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all the circumstances."  (cleaned up)).

In Torres I, the ICA determined that there was sufficient evidence of the victim's death and sufficient evidence the defendant had caused that death, despite absence of a corpse or any evidence relating to the manner of death.  122 Hawai'i at 14, 222 P.3d at 421.  This evidence included: the fact that the victim was last seen being escorted by defendant, who was observed wearing his military police uniform as well as a handgun; and the fact that defendant was apprehended five hours later in his truck, with a cash bag last carried by the victim, the victim's wallet and I.D. card, and the victim's hairbrush in the vehicle.  Id.  The evidence also showed that the victim's disappearance "was sudden and apparently unplanned and did not comport with his lifestyle and habits."  Id.

We review the sufficiency of the trial evidence in the strongest light for the prosecution in determining whether there was substantial evidence to support the trier of fact's conclusion as to every element of the charged offense.  Kalaola, 124 Hawaiʻi at 49, 237 P.3d at 1115.  We also give due deference to the right of the trier of fact to determine credibility, weigh the evidence, and draw justifiable inferences of fact from the evidence adduced.  State v. Sandoval, 149 Hawaiʻi 221, 232, 487 P.3d 308, 319 (2021) (cleaned up).

Upon review of the evidence, we hold that the jury could reasonably infer that Monsalve was deceased and not simply voluntarily absent for years without any trace, leaving behind without any contact her children, family, coworkers, and friends; and that Brown had intentionally or knowingly caused Monsalve's death, thereby establishing his guilt of second-degree murder.

1.    **There was substantial evidence to support the jury's conclusion that Monsalve was deceased.**

Monsalve's children, colleagues, and friends testified as to how abruptly Monsalve's disappearance occurred without any forewarning.  Monsalve's daughter testified that after Monsalve was last seen by her and her brother earlier in the day on January 12, 2014, and after Brown told MPD he saw Monsalve that same night, her mother had not contacted her about picking her

27

up at the airport when she was scheduled to return to Maui from O'ahu on January 14, 2014. Both Monsalve's daughter and youngest son testified that they had repeatedly texted and called their mother on Monday and Tuesday (January 13 and 14, 2014), uncharacteristically without any response. Monsalve's son testified that earlier during the day on January 12, 2014, he and his mother together attended a college admissions and financial aid workshop at the local community college. MPD investigators testified that Monsalve's checkbook, banking papers, work identification swipe-in card, college financial aid paperwork, her children's birth certificates, and a smashed cellphone were found soon after Monsalve was reported missing, in a public park dumpster ".3 miles" from Brown's apartment. Monsalve's daughter testified that the papers also found in the dumpster included titles to Monsalve's children's vehicles, her children's birth certificates, and Monsalve's personal items including old Mother's Day cards. And a witness testified that he had pulled a purse out of that dumpster on the night of January 13, 2014 and gave it to another person, who also testified that when she opened this pink Coach purse, she found a matching wallet with cards and a driver's license inside, and that another friend saw the purse and identified it as Monsalve's.

Monsalve's work friends and acquaintances became extremely

concerned when they realized on Tuesday, January 14, 2014, that Monsalve had uncharacteristically not called in sick for work or notified her coworkers of a planned absence on Monday or Tuesday. One of her friends testified that Monsalve had been housesitting for his brother, who was set to return on January 14, 2014 from a trip. When this friend went to check his brother's house for Monsalve, she was not there. And he became concerned when seeing that she had uncharacteristically left her and her son's personal items in the home, even though Monsalve knew the home's owners would be returning that day.

Another friend testified that Monsalve had agreed to house- and cat-sit for her later that same week, and that Monsalve would not have disappeared without making other arrangements. Yet another friend testified that she and Monsalve were making plans in anticipation of becoming empty-nesters, as both of their sons were graduating from high school in the spring, and that Monsalve would never leave her children without at least contacting them. Monsalve's son stated that just before his mother's disappearance, Monsalve had been planning a May 2014 graduation party for him, and was handing out senior photos to family and trying to get him scholarships to go to college.

Both of Monsalve's children testified that they had not heard from their mother since they last saw her on January 12, 2014. And as conservator of her mother's estate, Monsalve's

daughter testified that there was no activity on Monsalve's financial accounts since the day she vanished.  Monsalve's daughter testified that she and her mother were very close, particularly since Monsalve gave birth to her when Monsalve was only eighteen years old.  Although Monsalve's daughter was an adult, she testified how her mother continued to handle many of her personal tasks, including making her doctor appointments and doing her taxes.

Based on the voluminous testimony provided at trial by investigators, family, coworkers, and friends who knew Monsalve, the jury could have reasonably inferred that Monsalve had died on or around January 12, 2014, after she completely vanished without any explanation, personal contact, or financial transactions whatsoever, which did not comport with her usual lifestyle and habits as testified to by witness after witness at trial.

**2.    There was substantial evidence to support the jury's conclusion that Brown had acted intentionally or knowingly to cause Monsalve's death.**

When viewing the evidence adduced at trial in the strongest light for the prosecution, we conclude that the jury could have also reasonably inferred that Brown intentionally or knowingly caused Monsalve's death.

Brown told the MPD detectives, as well as Monsalve's daughter and several of Monsalve's friends, that he last saw

Monsalve in his apartment on January 12, 2014; and as he was falling asleep, he said Monsalve left his apartment between 10:00 and 10:30 p.m. to be picked up by her son. Monsalve's son testified that no one asked him to pick up his mother that night, nor did he do so. That is to say, the evidence presented to the jury, including Brown's statements to MPD and numerous other witnesses, established that Monsalve's last known physical whereabouts were in Brown's apartment, and that Brown was the last person to see her alive.

Monsalve's daughter testified she observed a Facebook post from Brown's account on Monsalve's Facebook homepage dated January 12, 2014 at approximately 7:00 p.m., suggesting that he was watching Monsalve in his apartment playing the video game Candy Crush. Monsalve's electronic data records taken from her recovered cellphone and her social media account indicated that her cellphone connected to Brown's IP address to access the internet at about 9:08 p.m., which is during the time frame Brown told MPD detectives Monsalve was physically with him in his apartment. And despite having told numerous people that he went to sleep at around 10:00 or 10:30 p.m. on the night of January 12, 2014, the evidence presented by witnesses' testimony and electronic records that Brown was active on his social media site at approximately 11:00 p.m.

Further, investigators testified that into the early

morning hours of January 13, 2014, Monsalve's cellphone continued to make connections to the internet through Brown's IP address until at least 1:04 a.m., hours after 10:30 p.m. on January 12, 2014, when Brown said Monsalve left his apartment.

As stated, Hawaiian Telcom disclosed to investigators in response to their subpoena, that the subject IP address was assigned to Brown's internet service account during the period January 1 to March 31, 2014.

Witnesses also testified that Brown told them that Monsalve had left her car with him the night of January 12, 2014 and requested that he drop it off at the auto repair shop the next day because it was "stalling," even though Monsalve's son did not observe any problems with the car on that day.

There was also testimony about Brown's listing of his apartment furniture for sale on Craigslist starting January 13, 2014, the day after Monsalve went missing. One of the witnesses described coming to Brown's apartment to buy a couch he was selling, which the witness described as smelling of chemicals. Another witness who texted Brown in response to the online ad Brown had posted for a table testified that Brown said he needed money for rent and electricity because his "roommate ditched out." This witness also testified that she had to tell Brown to "calm down" while she was talking to him. One of Brown's friends testified that he called her around 11:30 a.m. to 1:00

p.m. California time on January 13, 2014, sounding "upset, panicked, distressed." She testified that Brown asked her if she could get him a "burner phone" and that he was concerned about his phone being tapped. This friend also testified that when Brown called her a month later, he "wanted to know if I knew how to or could help him clear a hard drive" on a computer.

The witness who came later in January 2014 to repossess Brown's Dodge Nitro testified that based on her experience, Brown's vehicle was uncharacteristically very clean for a repossessed vehicle.

Further, investigators testified that someone attempted to log in to Monsalve's Facebook account on January 29, 2014 from Brown's IP address, despite there being no word or contact from Monsalve. Photographs of Brown's vacated apartment were entered into evidence, two of which showed a black internet router on Brown's kitchen countertop. In a subsequent voluntary telephone conversation with Detective Satterfield, Brown stated that he discovered while packing up his apartment that Monsalve had left his apartment with a pillow and blanket, which he claimed were now missing.

Additionally, witnesses testified about the extensive searches for Monsalve organized by family and friends after she vanished, pointing out that Brown had not participated in any of the searches. One witness, Monsalve's former brother-in-law,

testified that Brown told him that Monsalve very likely went to a bar in Kihei the night of January 12, 2014, which other witness noted was not where Monsalve usually socialized with friends. This witness also described how Brown asked him if he thought that Brown had had something to do with Monsalve's disappearance.

Viewing the evidence in a light strongest for the prosecution, with deference to the fact-finder's weighing of the evidence, we hold that there was sufficient evidence to support a conclusion that Brown exhibited a consciousness of guilt and intentionally or knowingly caused Monsalve's death.

B.    **The circuit court did not err in denying Brown's motion to exclude Brown's January 14, 2014 police interview.**

We review de novo a court's denial of a motion to suppress evidence allegedly obtained in violation of constitutional protections of a fundamental right. State v. Hewitt, 153 Hawai'i 33, 40, 526 P.3d 558, 565 (2023) (citation omitted).

As noted, Brown was interviewed by MPD Detectives Loo and Lee at the Wailuku police station on January 14, 2014, the same day Monsalve was reported missing. Brown asserts that the circuit court should have excluded the transcript of that interview "for want of warning and waiver of constitutional rights required" by State v. Ketchum's "bright-line rule." 97 Hawai'i 107, 34 P.3d 1006 (2001). The prosecution contends

that a <u>Miranda</u> warning was not required because Brown was not in custody.

In denying Brown's motion to suppress the interview statement, the circuit court orally ruled there was no <u>Ketchum</u> violation because Brown was not in custody.[6]  We agree.

Based on the totality of the circumstances, we affirm that MPD did not have probable cause to arrest Brown before, during, or at the conclusion of the interview, and Brown was not subjected to a custodial interrogation or an unlawful de facto arrest.  Brown voluntarily came to the police station to speak with the detectives.  Further, questioning by the detectives was not sustained and coercive and concluded after thirty minutes.  Brown was free to leave, and did leave after the interview ended.

Under article I, section 10 of the Hawai'i Constitution, "a statement made by a defendant under 'custodial interrogation' without a <u>Miranda</u> warning must be suppressed as unconstitutionally elicited."  <u>State v. Hoffman</u>, 155 Hawai'i 166, 169, 557 P.3d 895, 897 (2024).  <u>Ketchum</u> set forth the "bright-line rule" as to when a person is considered "in custody" for

---

[6]    Brown notes that the trial court did not memorialize this ruling in a written order.

purposes of constitutional protections under article I, section 10:

> [A] person is "in custody" for purposes of article I, section 10 of the Hawai'i Constitution <u>if an objective assessment of the totality of the circumstances reflects either</u> (1) that <u>the person has become impliedly accused of committing a crime because the questions of the police have become sustained and coercive</u>, such that they are <u>no longer reasonably designed briefly to confirm or dispel their reasonable suspicion</u> <u>or</u> (2) that the <u>point of arrest has arrived</u> because either (a) probable cause to arrest has developed or (b) the police have subjected the person to an unlawful "de facto" arrest without probable cause to do so.

Ketchum, 97 Hawai'i at 126, 34 P.3d at 1025 (quoted in Hewitt, 153 Hawai'i at 36, 526 P.3d at 561) (emphases added).

This court in Hewitt reaffirmed Ketchum's bright-line rule that probable cause for arrest, regardless of whether arrest was initiated, characterizes a person as "in custody" for purposes of assessing the requirement for a Miranda warning and waiver for further questioning. Hewitt, 153 Hawai'i at 44, 526 P.3d 569. We apply Ketchum's bright-line rule in assessing Brown's argument that he was subject to custodial interrogation on January 14, 2014.

Brown argued to the circuit court that he was in police custody for about thirty minutes while the police interviewed him. However, the record bears out that when Brown was interviewed that day, Detectives Loo and Lee did not have probable cause to arrest or detain him. In Brown's motion to exclude his statement, Brown asserted that Monsalve was reported

36

missing by her family, "mere hours" before he was interviewed. Reviewing the content and flow of the detectives' questions to Brown, MPD had not yet developed probable cause to consider Monsalve's disappearance to be criminal in nature, nor to see Brown as subject to arrest.

Brown does not allege any fact or point to any evidence in the record demonstrating that MPD had developed probable cause to arrest or detain him before the interview. Instead, Brown's custodial interrogation contention is focused on the nature of the interview questions and the location of the interview.

The totality of the circumstances with respect to Brown's interview includes the place and time of day of the interrogation; the length of the interview; the nature of the questions asked; the conduct of the police; and any other relevant circumstances. Hewitt, 153 Hawaiʻi at 36-37, 526 P.3d at 561-62 (determining from the totality of the circumstances whether a defendant is in custody or otherwise deprived of their freedom of action for Miranda purposes, which includes "the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and all other relevant circumstances" (citation omitted).).

During the hearing on the motion, Brown's attorney characterized the thirty-minute interview as custodial,

emphasizing the physical dimensions and design of the interview room.  The DPA countered that at the time of the interview, it was a missing persons case and not a murder investigation, and that the interview with Brown sought information on Monsalve's possible whereabouts.

The place, time, and length of the police interview was at the Wailuku police station on January 14, 2014, starting at 5:28 p.m. and lasting about thirty minutes.  Detective Lee described the interview room as being "pretty small," roughly eight feet by ten feet, windowless, in which both detectives, dressed in plain clothes with their firearms, sat around a table with Brown and spoke with the door closed.  Brown argued in his motion to exclude the interview that when he was asked to come to the station to discuss Monsalve's disappearance, "[n]o option was provided for [him] to do a telephonic interview."  At the same time, there is nothing in his motion reflecting that Brown had requested a telephone interview.

Interviews that take place at a police station do not alone trigger Miranda warnings, although the location is a relevant circumstance to consider when determining if a custodial interrogation occurred.  Here, aside from highlighting the layout of the interview room, Brown did not allege any overbearing show of force or other conduct on the part of the detectives while being interviewed in the room.

38

The nature of the questions asked by investigators must also be considered in examining whether a custodial interrogation occurred.  In State v. Ah Loo, this court reaffirmed that

> [p]ersons temporarily detained for brief questioning by police officers who lack probable cause to make an arrest or bring an accusation need not be warned about incrimination and their right to counsel, until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and [has] become sustained and coercive.

94 Hawai'i 207, 210, 10 P.3d 728, 731 (2000) (quoted in Ketchum, 97 Hawai'i at 123, 34 P.3d at 1022).  Fact-finding inquiries and questioning that seeks to clarify a situation, dispel suspicion, or assist investigators in deciding upon a reasonable course of investigatory action is not considered custodial interrogation.

At the beginning of the interview, Detective Loo explained they were investigating a "missing person" case and proceeded to ask Brown initial background questions (e.g., his name, social security number, date of birth, home address, telephone number, height, weight, hair color, how long he lived on Maui, where he was born, employment, high school he attended, and whether his mind was clear).  Brown was also asked preliminary questions about his relationship with Monsalve, with Brown explaining that he and Monsalve decided to split up two weeks earlier, and that he had asked her and her son to move out of his place.

Brown was asked when he last saw Monsalve and he told the

detectives it was on Sunday, January 12, 2014 between 10:00 and 10:30 p.m. that he was at his house on the couch when "[s]he kissed me goodbye." When asked if anyone else was home at the time, Brown said he did not know if his roommate was in her room or not. When asked what kind of relationship he had with Monsalve, Brown described themselves as "good friends," "pretty good overall" although Monsalve "likes to argue and that's probably the extent of anything bad in our relationship." Detective Loo then asked Brown about their relationship, including any history of domestic violence, which Brown stated they "never even went there."

The detectives then moved on and asked whether Brown had spoken to Monsalve's daughter, whether Monsalve had ever disappeared like this before, to which Brown replied that "it wasn't no big deal," though he was "upset" because he was supposed to fly out earlier that day (afternoon of January 14) to San Jose for a week and that Monsalve was supposed to housesit for him and watch his cat, "and she never called me back."

Brown was then asked about his flights and travel plans; about his relationship with Monsalve ("we absolutely love each other," he replied); about how their relationship ended ("she would not stay out of the dive bars" and too much arguing); and whether Monsalve was abusive to her youngest son, whom Brown had

stated came to pick his mother up after she left his apartment (Brown answered no).

Detective Loo next asked Brown about one of Monsalve's coworkers, where Monsalve worked, and what she did. The continuing questions ranged for many minutes about Monsalve's friendships and how she appeared when he last saw her on January 12, 2014. Brown volunteered that she was a little buzzed, and left his place after kissing him on the cheek and telling him she was going to have her son pick her up as he was falling asleep while watching a movie. He expressly stated, "[Monsalve] didn't wanna drive her car back to Kihei . . . because she said it was running bad" and "she didn't wanna take my car and said 'I'll just have [Monsalve's son] pick me up.'" Brown told the detectives that he had no idea how Monsalve actually left his place and that "[s]he went outside and I figured [Monsalve's son] picked her up" and that she had to have been picked up by somebody because "[s]he would not just walk away."

Detectives asked about Monsalve house-sitting for friends, problems she may have had with others, whether Brown heard from her, places she frequented, her emotional state, talk of self-harm, what their two-year dating relationship was like, about his new roommate, the movie he and Monsalve were watching Sunday night, and (again) if he had any information that would help the detectives to figure out where Monsalve was. Asked about what

Monsalve was doing the weekend of her disappearance, Brown replied that "she spent the whole weekend at my house[,]" and that on Sunday, she left to go do college paperwork with her youngest son, returning to Brown's apartment around "five-ish." During this line of questioning, Brown was asked "is there anything you did to [Monsalve]," to which he answered "No" and that Monsalve left his house "just fine" on Sunday.

The detectives then moved on and asked Brown additional questions about whether he could give any information to help locate Monsalve and whether he had done anything to harm her or cause her disappearance, which Brown denied.  The detective noted that this was allegedly "out of the ordinary" for Monsalve, that "the family seem[ed] to think you have something to do with it," and that Brown was the last person to see Monsalve.  Detective Loo told Brown clearly that he did not want the family to think Brown had something to do with Monsalve's absence if he had not done something to her, which Brown affirmed that he did not.  The detective marked these aforementioned questions as "different" than questioning he would ask Brown if he "thought [Brown] had something to do with" Monsalve's disappearance.  When Detective Loo asked Brown about a post Brown made the night of January 12 on Monsalve's Facebook, "about Candy Crush and talking[,]" Brown's voice sounded concerned.  However, the detectives then moved on and

asked additional questions about Monsalve's relationship with her youngest son and whether it was "bad," "violent" or "abusive"; if Monsalve owned any other cars; which other friends Monsalve might be hanging out with; and "anything else you can help me with as far as finding out where she might hang, who she hangs out, you know where she might go."

Brown was further asked whether Monsalve had a Facebook page, if there were security cameras at his apartment complex, and whether Monsalve ever went out drinking to the point of passing out.

Upon conclusion of Brown's interview with the detectives, Detective Loo thanked Brown for his cooperation after which Brown left the station.

Brown's counsel argued before the circuit court that there were only "two or three pages of questions pertaining to Mr. Brown's personal information, his physical attributes, whether or not he was thinking clearly, and then about his relationship with Ms. Monsalve. The remainder of the interview . . . [was] accusatorial" and coercive. Brown asserted in his motion that questions about his relationship with Monsalve and the last time he saw her, questions about whether they experienced domestic violence together, and questions as to whether he knew where Monsalve was that evening were more sustained and coercive.

When the circuit court denied Brown's motion, the court observed that "based upon what Detective Lee has testified, I am satisfied that at this point there was a missing person report, and that's how this was being investigated. I would agree that . . . the family may have had its own suspicions, but the police questioning is not of the nature that I find to be an interrogation." The circuit court further reiterated that Brown had voluntarily appeared at the police station, that this was at the point on January 14, 2014 that a missing person report was filed with "no indication that any crime had been committed," and that Brown was free to leave the station.

In assessing the totality of the circumstances, the circuit court did not err in denying Brown's motion to exclude the interview statement. The interview was not sustained and coercive nor was it a de facto arrest. Rather, it was general fact-finding focused on clarifying the situation, dispelling suspicion, and gaining knowledge into a missing person's report received only a few hours earlier to further shape a reasonable course of investigatory action.

C. **The circuit court did not err in denying Brown's motion to suppress his subscriber name, provided to investigators by Hawaiian Telcom in response to a subpoena seeking information on the account to which Hawaiian Telcom assigned the subject IP address.**

1. **Subpoenaed Information and Brown's Motion to Suppress**

During the course of its investigation, MPD obtained

44

electronic records indicating that posts on Monsalve's Facebook account page were linked to Brown's IP address the night of January 12, 2014 through the morning of January 13, 2014. Monsalve's Facebook data indicated her account was active from Brown's IP address on January 12, 2014 at 9:08 p.m. Based on Brown's January 14, 2014 interview with MPD detectives, the investigators established that Monsalve was in Brown's apartment on January 12, 2014 from 5:00 p.m. to approximately 10:00 to 10:30 p.m. Additional information obtained by investigators from Monsalve's Facebook account showed that her Facebook had a log-in from that same IP address on January 29, 2014, which was over two weeks after she disappeared.

Hawaiian Telcom responded to the prosecution's subpoena seeking subscriber information on the account to which the subject IP address 72.253.119.239 had been assigned from January 1 to March 31, 2014.[7] Hawaiian Telcom identified the account's subscriber name as "Bernard A. Brown" and provided a telephone number, an address, and the account activation date.

Brown filed a motion to suppress the information, which the circuit court granted in part and denied in part by suppressing all the information except for Brown's name. On appeal, Brown

---

[7] Brown describes the subpoena as seeking "subscriber information for the person to whom Hawaiian Telcom assigned that IP address for the first quarter of 2014."

45

asserts that the disclosure of his personal name on his Hawaiian Telcom subscriber account pursuant to the subpoena violated his constitutionally protected privacy rights.

The prosecution contends that Brown failed to show that he had a legitimate expectation of privacy in his Hawaiian Telcom subscriber name linked to the subject IP address. The prosecution further asserts that this information was lawfully obtained through a subpoena issued pursuant to HRS § 28-2.5, and that Hawaiian Telcom's release of subscriber and IP address number information was permissible under HRS § 803-47.6(d)(2)(D).[8]

As discussed earlier, we review the circuit court's

---

[8]    HRS § 803-47.6(d)(2)(D) (2014) parallels a similar federal statute and provides in relevant part:

> (2)  A provider of electronic communication service or remote computing service shall disclose a record or other information pertaining to a subscriber to, or customer of, the service (other than the contents of an electronic communication) to a governmental entity only when:
>
> . . .
>
> (D)  Presented with an administrative subpoena authorized by statute, an attorney general subpoena, or a grand jury or trial subpoena, which seeks the disclosure of information concerning electronic communication, including but not limited to the name, address, local and long distance telephone billing records, telephone number or other subscriber number or identity, and length of service of a subscriber to or customer of the service, and the types of services the subscriber or customer utilized.

HRS § 803-47.6(d)(2)(D) (emphases added).
    Brown has not challenged the constitutionality of this statute, instead challenging the statute providing county prosecutors the authority to issue administrative subpoenas, HRS § 28-2.5(b).

decision de novo under a right/wrong standard.

> **2.   Brown had no Fourth Amendment protection of his subscriber information provided to a third-party internet service provider and its link to the subject IP address.**

Brown argues he had a protected privacy interest in his Hawaiian Telcom subscriber name and its connection to the subject IP address under the Fourth Amendment to the United States Constitution.   Brown's contention is not supported by federal statute or case law.

Under 18 United States Code ("U.S.C.") § 2703(c)(2), Congress mandated that "a provider of electronic communication service or remote computing service <u>shall disclose</u> to a governmental entity," upon issuance of an administrative subpoena, <u>subscriber or customer information including their name</u>, address, telephone number(s), records of connection and/or session times, length and type of service used, and subscriber "identity."   18 U.S.C. § 2703(c)(2) (emphasis added).

Further, federal case law does not lend support to Brown's position.   In <u>United States v. Perrine</u>, 518 F.3d 1196, 1204 (10th Cir. 2008), the defendant asserted his internet subscriber information, including his name, was protected by the Fourth Amendment.   <u>Id.</u> at 1204.   The Tenth Circuit Court of Appeals definitively noted, "Every federal court to address this issue has held that subscriber information provided to an internet

47

provider is not protected by the Fourth Amendment's privacy

expectation."  Id.  And in United States v. Forrester, the Ninth

Circuit opined:

> e-mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information. Like telephone numbers, which provide instructions to the "switching equipment that processed those numbers," e-mail to/from addresses and IP addresses are not merely passively conveyed through third party equipment, but rather are voluntarily turned over in order to direct the third party's servers.

512 F.3d 500, 510 (9th Cir. 2008) (citation omitted).  Federal

case law does not recognize a legitimate expectation of privacy

in a subscriber name or the connection between a name and an IP

address.[9]

Brown relies on Carpenter v. United States, 585 U.S. 296

(2018) to postulate that "personal information" maintained by a

third-party wireless company is protected by the Fourth

Amendment. That case is inapposite.  The "personal information"

at issue in Carpenter was a wireless carrier's data that

---

[9]  See Guest v. Leis, 255 F.3d 325, 336 (6th Cir. 2001) (holding, in a non-criminal context, that "computer users do not have a legitimate expectation of privacy in their subscriber information because they have conveyed it to another person--the system operator"); United States v. Hambrick, 225 F.3d 656 (4th Cir. 2000) (unpublished), affirming United States v. Hambrick, 55 F. Supp. 2d 504, 508-09 (W.D. Va. 1999) (holding that there was no legitimate expectation of privacy in non-content customer information provided to an internet service provider by one of its customers); and United States v. Lifshitz, 369 F.3d 173, 190 (2d Cir. 2004) ("Individuals generally possess a reasonable expectation of privacy in their home computers. . . . They may not, however, enjoy such an expectation of privacy in transmissions over the Internet or e-mail that have already arrived at the recipient.").

comprehensively tracked and recorded the physical movements of a user's cellphone through that phone's "pings" to the carrier's cell towers. Carpenter, 585 U.S. at 306. Carpenter asserted a privacy interest in his wireless carrier's data that had recorded his past travels. Id. at 302. The Carpenter court framed the issue as applying the Fourth Amendment to law enforcement's "ability to chronicle a person's past movements through the record of his cell phone signals." Id. at 309. The Court ultimately held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through [its cell-sites]." Id. at 310. The Court noted that "there is a world of difference between limited types of personal information," like records of telephone numbers dialed or financial records held by a bank, "and the exhaustive chronicle of location information casually collected by wireless carriers today." Id. at 314.

Unlike cell phone tower information that can provide detailed surveillance of an individual's physical movements, Brown's personal name is not revelatory in the nature and scope of Carpenter's real-time cellphone tower geolocation information. Because of this kind of tracker surveillance, Carpenter provided a narrow limitation of the third-party doctrine with respect to excessively revelatory and intrusive personal customer information obtained from a service provider's

cell phone tower data.

Thus, federal authorities do not support Brown's contention that he had a Fourth Amendment protected privacy right in his name and its connection to the subject IP address that Hawaiian Telcom assigned to his account.

**3.    Under state law, Brown did not establish a legitimate privacy interest in his subscriber name and its link to the subject IP address.**

The circuit court observed that the subject IP address was obtained from the data on Monsalve's cellphone. The same IP address was linked to Brown's Facebook account in Facebook's records, which Brown did not challenge.

The circuit court noted in ruling on Brown's motion to suppress:

> [T]here's an IP address. It's on [Monsalve's] phone. [The investigator] could access through subpoena duces tecum only the information from providers that this is an IP address and this is the account to whom it belongs. Where that router is located, that's not part of it. . . . To whom was that IP address assigned? Well, it's associated with an account for Bernard Brown . . . and it's Hawaiian Telcom, and that's it. But not as to the address, not as to any of those other things. So it's limited to that area of coverage.

(Emphasis added.) Thus, other than identifying Brown as the person whose name was on the account to which the IP address was assigned, the circuit court suppressed all the other information including the account's street address, telephone number, and

account activation date.[10]

Brown accurately states that under article I, section 7 of the Hawai'i Constitution, an individual may still retain an expectation of privacy in information disclosed to a third-party. It is well-established that our state constitution may set higher protections of a person's fundamental rights than those set by the federal constitution. See State v. Curtis, 139 Hawai'i 486, 497, 394 P.3d 716, 727 (2017).

During the pre-trial suppression hearing, the prosecution argued that Brown had to first establish an actual subjective expectation of privacy in his subscriber information, and second, to show that society recognizes that expectation as being reasonable. This is correct. As we reiterated in State v. Bonnell, and reaffirmed again in Walton, this court

> has adopted the following two-part test, borrowed from the concurring opinion of Justice Harlan in [United States v. Katz], 389 U.S. [347,] 361, to determine when a person's expectation of privacy may be deemed reasonable: "First, one must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable."

75 Haw. 124, 139, 856 P.2d 1265, 1273-1274 (1993); see also, Walton, 133 Hawai'i at 96, 324 P.3d at 906.

The prosecution asserted before the circuit court and reiterates on appeal that Brown failed to "factually establish"

---

[10] The record reflects that Brown's home address was already known to Monsalve's children, friends, and MPD.

that he "held a subjective expectation of privacy in the information" or a reasonable expectation of privacy in the simple link between his name and the Hawaiian Telcom account to which the subject IP address was assigned. The prosecution maintains that Brown "presented no evidence demonstrating that he had a reasonable expectation of privacy related to his subscriber information associated with the Hawaiian Telcom IP address." They add that "the simple fact of his name [did] not provide access to '[t]he sum of an individual's private life,' nor [did] it provide intimate details into a constitutionally protected area."

Before the circuit court, Brown did not offer any factual basis demonstrating an actual subjective expectation of privacy in his subscriber name, such as a declaration or affidavit setting forth a belief that he considered such information to be private and that Hawaiian Telcom would keep his name private, or that Hawaiian Telcom customers, in general, expect their subscriber names to be kept private. As the prosecution points out:

> He could have testified that he subjectively believed that his subscriber information was private. He might have presented evidence of Hawaiian Telcom's policies or procedures to show a privacy interest in the information. Perhaps he could have tried to show that his non-content subscriber information somehow revealed "intimate details" of his life. Instead, he did not present any evidence in support of his motion[.]

Brown appears to first assert an actual subjective

52

expectation of privacy in his appellate opening brief, stating in conclusory fashion that he "disclosed his name and address to Hawaiian Telcom for the limited purpose of his business with them, not for further dissemination of either to the police or a prosecutor for the purpose of prosecuting him."  Brown fails to provide a record citation pointing to where in the record he raised or presented evidence, such as a declaration or affidavit, in support of this purported factual contention.

In Bonnell, defendants were postal workers who were suspected of gambling in the Lahaina post office.  Investigators installed hidden video cameras in a break room and conducted twenty-four hour surveillance of the defendants' activities for an entire year.  75 Haw. at 131-32, 856 P.2d at 1270-71.  Defendants later moved to suppress the evidence obtained from the warrantless video surveillance.  Id. at 130, 856 P.2d at 1270.  During the suppression hearing, defendants established an "actual subjective expectation of privacy in the break room" for nine distinct reasons, including that the break room was not a public place, as it was limited to employees and authorized visitors; that the room was not visible to the public area of the post office or from outside the building; that none of the defendants had ever heard of video surveillance by the police being used to investigate in the post office; there was no provision in the employee manual or collective bargaining

agreement; the room was used to store employees' personal belongings; and the defendants did not believe they were subject to police video surveillance. Id. at 133, 856 P.2d at 1271. One of the defendants added that "she considered the break room to be a private place and that only postal employees and invited guests were allowed to be there." Id. at 134, 856 P.2d at 1271.

The trial court granted defendants' motion to suppress the video surveillance finding that "'[t]he defendants demonstrated subjective expectations that they would not be covertly viewed and videotaped by government agents in their employee breakroom . . . and that their activities in that area would remain private.'" Id. at 139, 856 P.2d at 1274.

This court upheld the trial court noting that the prosecution did not argue that the testifying defendant failed to establish "her actual subjective expectation of privacy" in the employee break room. Id. at 141, 856 P.2d at 1275.

In State v. Biggar, we held that a defendant had a reasonable expectation of privacy in a closed toilet stall. 68 Haw. 404, 408, 716 P.2d 493, 496 (1986). While defendant was inside a closed toilet stall, a police detective went into an adjacent stall, stood on the toilet, and peered over the partition and observed the defendant taking his hand out from a toilet seat cover dispenser. Id. at 406, 716 P.2d at 494. The detective later found cocaine in the dispenser after the

defendant exited his stall.  Id.  Defendant contended that he had a reasonable expectation of privacy while in the closed toilet stall that was violated when the detective looked over the partition.  Id., 716 P.2d at 494-95.  Applying our two-part privacy test, we concluded that "[defendant] exhibited a subjective expectation of privacy by closing the stall door.  That the door did not close completely did not eliminate this expectation, since the crack was too small to afford Detective Peterson more than an occasional glimpse of [defendant's] shoulder."  Id. at 406-407, 716 P.2d at 494-495.

In contrast, Brown did not exhibit or present any evidence to the circuit court of an actual subjective expectation of privacy in his subscriber name.  On this record, we hold that Brown did not establish an actual subjective expectation of privacy in his Hawaiian Telcom subscriber name or the link between his name and the subject IP address.  Accordingly, we affirm the circuit court's denial of Brown's motion to suppress to the extent Brown's Hawaiian Telcom subscriber name linked to the IP address was admitted into evidence.

4.  **Even if Brown had established a privacy interest in his name, the admission of his name into evidence was harmless.**

In Walton, this court agreed that under the circumstances in that case, it was "unnecessary to decide whether . . . [the defendant] possessed a legitimate expectation of privacy in his

name because the introduction of that evidence at trial was plainly harmless." 133 Hawaiʻi at 99, 324 P.3d at 909. <u>Walton</u> arose from an attempted murder case where a GNC customer club card, listing only an account number but not a name, was found at the crime scene. We held that "the association of Walton's name with the GNC card served only to establish his presence at the crime scene. However, that fact was also established by a wealth of other evidence presented at trial." <u>Id.</u>

In the instant case, even if Brown had established a legitimate expectation of privacy in his subscriber name, the disclosure and admission of his name into evidence was harmless error.

In deciding whether an error is harmless, this court considers whether there is a reasonable possibility that the error might have contributed to the conviction. <u>State v. Veikoso</u>, 126 Hawaiʻi 267, 283, 276 P.3d 997, 1006 (2011); <u>see also</u> HRPP Rule 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").

In the present case, the subject IP address was used to determine Monsalve's and/or her cellphone's location between January 12 and January 16, 2014. Brown stated in his motion to suppress his subscriber name that "MPD's use of <u>the information</u> they obtained without a warrant <u>was significant</u> because MPD was

56

able to take a logging of different IP addresses from Ms. Monsalve's accounts <u>to determine where a device was when it was being accessed</u>." (Emphasis added.) Thus, the significant question was where Monsalve and/or her cellphone was when her phone connected to the subject IP address.

Monsalve's presence at Brown's apartment on January 12, 2014 between 5:00 and 10:00 to 10:30 p.m. was established through Brown's statements to several witnesses and to MPD investigators. MPD investigators testified that Monsalve's cellphone accessed her social media, email, and other websites that evening. Specifically, Monsalve's Facebook records indicated that her device accessed that site when using the subject IP address at around 9:08 p.m. while, according to Brown, she was physically in his apartment. Detective Bigoss also testified that her Facebook records indicated someone accessed her Facebook account from the subject IP address at 1:04 a.m. on January 13, 2014.

At trial, Detective Satterfield testified that Brown's Facebook records showed that his Facebook account was accessed just before and just after January 12, 2014, by a device using the same subject IP address. Brown claimed that Monsalve physically left his apartment between 10:00 and 10:30 p.m., yet her cellphone continued to connect to that IP address to access her Facebook account at least until 1:04 a.m. on January 13,

2014.[11]

Whether or not the subject IP address was linked to Brown's subscriber name was irrelevant to determining where Monsalve and/or her cellphone was when it connected to her Facebook account on January 12 and 13, 2014 through online access provided by Brown's IP address because Brown had already placed Monsalve in his apartment when the Facebook app on her cellphone connected to her Facebook account through that IP address at 9:08 p.m.

In his trial testimony, Detective Bigoss explained IP address functioning in how one accesses the internet using that number:

> when your computer is communicating over the internet protocol [IP] with another device, you're exchanging packets of data and embedded in these data packets is your IP address and the other computer's IP address, and that's necessary to ensure that your data gets to the right place and that other computer's data gets back to you correctly. If you don't have those addresses, it doesn't know where to go and our stuff will just -- it won't work. You won't get to CNN. You won't get to Google. You won't get your e-mail. So without those -- the addresses are basically the way that everything figures out how to go where it needs to go properly.

Detective Bigoss gave an example of how connections to wireless networks work in terms of physical proximity. He explained that if he used a retail store's free wifi network on his cellphone, he would not be able to continue using that wifi if he drove

---

[14]     Two photographs of an internet service router on Brown's kitchen counter were entered into evidence for the jury's consideration.

away from the store because the wifi would have a limited range.

Before investigators received the subpoenaed information from Hawaiian Telcom, MPD already knew that Monsalve's cellphone had accessed Facebook the night of January 12, 2014 using the subject IP address to connect to Facebook while Monsalve was in Brown's apartment. Investigators testified that Monsalve's Facebook account records showed activity through Brown's IP address at 9:08 p.m. January 12, 2014 and 1:04 a.m. January 13, 2014. Thus, Brown's contention that his name allowed MPD to track where Monsalve's cellphone was when it accessed his IP address was immaterial in determining where Monsalve's cellphone was when she accessed the internet. Whether or not the subject IP address was linked to Brown's subscriber account and his name was of no consequence to a jury's reasonable inference about Monsalve's cellphone's whereabouts after 10:30 p.m., when Brown said she left to be picked up by her son.

For these reasons, we hold that even if Brown had established a legitimate expectation of privacy in his subscriber name, the admission of his name into evidence was harmless as the association of the IP address with Brown's residence and its relation to Monsalve's location was established by Brown's own statements and other evidence presented at trial.

D.   **The prosecution did not engage in prosecutorial misconduct when the DPAs used the phrase "we know" during closing and rebuttal arguments.**

Brown alleges that prosecutors engaged in reversible misconduct by repeating the phrase "we know" during their closing and rebuttal arguments, thus improperly asserting personal opinion about the evidence against Brown.  DPA 1 used the "we know" phrase once in closing argument to reference Brown having taken Monsalve's car to the mechanic shop the day before she was reported missing.  DPA 2 also used the "we know" phrase several times during rebuttal.  Brown did not object to these remarks, and the circuit court did not address them.  As such, this point of error is subject to our plain error review.

The prosecution contends that the DPAs were using a simple turn of phrase to argue from the evidence presented at trial.  The prosecution distinguishes the DPAs' statements in the present case from State v. Conroy, 148 Hawai'i 194, 468 P.3d 208 (2020) and the ICA's unpublished Summary Disposition Order (SDO) in State v. Browder, No. CAAP-22-0000267, 2023 WL 6940233 (Haw. App. Oct. 20, 2023) (SDO) (overruled in part on other grounds; cert. not sought on current issue), because it was simply "a turn of phrase," and the DPA's statements were legitimate argument drawing reasonable inferences from the evidence adduced at trial.  Unlike the DPA's assertions in Browder, the prosecution here argues that DPA 2's statements of "we know" did

not go directly to the elements of the charged crime.  Thus, there was no expression of personal opinion as to the weight of evidence, no inflammatory remarks of an offensive nature, and no misconduct.

We agree with the prosecution and hold that the circuit court did not commit plain error.  The DPAs' use of the phrase "we know" in the context of those utterances and the evidence presented in this case, as well as the reasonable inferences a jury could draw from that evidence, was not prosecutorial misconduct.

As we discussed in State v. Willis, we define "prosecutorial misconduct as 'a legal term of art that refers to any improper action committed by a prosecutor, however harmless or unintentional.'"  156 Hawai'i 195, 204, 572 P.3d 668, 677 (2025) (quoting State v. Udo, 145 Hawai'i 519, 534, 454 P.3d 460, 475 (2019)).  We first review allegations of prosecutorial misconduct to determine whether the prosecutor's actions were improper.  Id.  If so, we must then determine whether the violation of the right to a fair trial was harmless.  State v. Conroy, 148 Hawai'i at 201, 468 P.3d at 215.

In Hirata, this court affirmed that a prosecutor's expression of personal belief about witness credibility or a remark introducing new evidence are distinct instances of

misconduct.  152 Hawaiʻi at 33, 520 P.3d at 231.  "[T]his court acknowledges that a prosecutor's improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."  Willis, 156 Hawaiʻi at 204, 572 P.3d at 677 (cleaned up).

In Udo, this court stated:

> [I]t is well-established that prosecutors are afforded wide latitude in closing to discuss the evidence, and may state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence.  In all stages of trial, however, a prosecutor remains bound by the duty to seek justice, not merely to convict.

145 Hawaiʻi 519, 536-37, 454 P.3d 460, 477-78 (2019) (cleaned up).  This latitude is not without limit, as the prosecutor's argument must be consistent with the evidence, fairly presented, legitimate, and with reasonable inferences drawn from the evidence.  Willis, 156 Hawaiʻi at 204, 572 P.3d at 677; see also State v. Pasene, 144 Hawaiʻi 339, 367, 439 P.3d 864, 892 (2019); State v. Mainaaupo, 117 Hawaiʻi 235, 253, 178 P.3d 1, 19 (2008).

In Brown's trial, both DPAs used the phrase "we know" as a turn of phrase in their review of the evidence brought forward at trial.  As such, we determine that these statements were not prosecutorial misconduct.

In recapping the electronic data presented to the jury by investigators, DPA 2 stated, "how do we know [Monsalve's] phone

is at the defendant's apartment throughout Sunday night?  We know that because of the IP address and [Monsalve's] Facebook account."  In another statement, DPA 2 noted that Monsalve's "Facebook account shows activity on this IP address at 9:08 p.m. on Sunday night, and we know [Monsalve] was at the defendant's apartment because the defendant himself said she was there[.]"

Here, the DPAs' use of "we know" is distinguishable from prejudicial statements in Conroy in that Conroy involved a prosecutor's significant departure from the evidence presented and utterance of statements that appeared to use the weight of the office to go beyond the evidence adduced at trial into irrelevant and novel opinions or personal experiences of the DPA.  148 Hawaiʻi at 202-206, 468 P.3d at 216-220.

In reviewing the DPAs' utterances here, they do not fall outside the wide latitude afforded to prosecutors in closing to state, discuss, and comment on the trial evidence and to draw all reasonable inferences from the evidence.  Therefore, we hold that the prosecutors' "we know" remarks during closing and rebuttal arguments, under the facts and circumstances of this case, were permissible turns of phrase uttered in sentences drawing reasonable inferences from the trial evidence and did not constitute prosecutorial misconduct.  As such, we find no plain error.

**E.  The evidence did not support a jury instruction on unanimity of acts or a rational basis to instruct on lesser included offenses.**

Brown initially proposed jury instructions on unanimity and the lesser charge of reckless manslaughter, but later withdrew both requests.  On appeal, Brown contends the circuit court plainly erred in not giving a unanimity instruction and should have sua sponte instructed the jury on lesser included offenses.  We disagree.

**1.  There was no evidence of multiple acts as a separate basis for guilt warranting a unanimity (<u>Arceo</u>) jury instruction.**

Both Brown and the prosecution initially requested a unanimity instruction be given to the jury.  Brown's counsel later withdrew his request, explaining to the circuit court:

> In a nutshell, <u>Arceo</u> presented <u>the issue of jury unanimity when there is evidence of multiple acts by the defendant, each of which could be a separate basis for guilt</u>.  No such issue exists in the instant case.  There has been no direct evidence presented of an act undertaken by Mr. Brown which caused Ms. Monsalve's death.  <u>There certainly has not been evidence presented of more than one act by Mr. Brown which caused Ms. Monsalve's death.  As such, there is no unanimity issue and no Arceo instruction is necessary</u>.
>
> . . . .
>
> [T]he State [must] prove beyond a reasonable doubt that Mr. Brown intentionally or knowingly engaged in conduct, and that by engaging in that conduct, he intentionally or knowingly caused the death of Ms. Monsalve.  <u>There is no requirement that the State prove beyond a reasonable doubt how Ms. Monsalve's death was caused by Mr. Brown</u>.  Again, had there been direct evidence presented of multiple acts by Mr. Brown, each of which could have conceivably caused Ms. Monsalve's death, an <u>Arceo</u> instruction would be appropriate.  No such evidence was presented in this case.

(Emphasis added.)

During the settling of jury instructions, Brown's counsel further explained the basis for withdrawing his proposed Arceo jury instruction:

> [W]e all kind of struggled thinking about sort of how to properly instruct the jury in a missing person case, but the bottom line is I think that the State essentially is required to prove how Ms. Monsalve was -- they are required to prove beyond a reasonable doubt that Mr. Brown did intentionally or knowingly cause her death. That's covered by the instruction that we're about to discuss, and so note the Arceo instruction would serve no purpose other than to confuse and disorient our jury.

The prosecution agreed.

Before ruling, the circuit court explained to the parties,

> [G]iven the facts of this case -- one fact that is undisputable is it's a missing person; that the focus here is on the intentional or knowing conduct of the defendant, and that's what the State needs to prove beyond a reasonable doubt, not specifically an act as to -- assuming the jury finds beyond a reasonable doubt that Ms. Monsalve is deceased because that's the first question that they have to answer. If they answer that question, they must then answer the question, [d]id Mr. Brown knowingly or intentionally cause her death by beyond a reasonable doubt? If they can't reach that conclusion, any potential facts that would support how that occurred are meaningless. They're not meaningless for what occurred, but for purposes of the instruction. So I agree with that.

(Emphasis added).

The court accordingly marked the Arceo unanimity instruction as withdrawn.

Brown asserts on appeal that "[b]ecause the State elected to submit this case to the jury as an 'any act' case, the circuit court should have given an Arceo specific-act unanimity instruction."

In State v. Valentine, where defendant was charged with

attempted prohibited possession of a firearm, we explained:

> The Arceo decision dealt with a situation in which the prosecution had adduced evidence regarding independent incidents, during each of which the defendant engaged in conduct that could constitute the offense charged, and each of which could have been, but were not, charged as separate offenses. Inasmuch as these independent instances of culpable conduct were submitted to the jury in a single count that charged but one offense, we held that a specific unanimity instruction was necessary to ensure that each juror convicted the defendant on the basis of the same incident of culpable conduct.

93 Hawai'i 199, 208, 998 P.2d 479, 488 (2000). We further explained that in order for an Arceo instruction to be required:

> two conditions must converge before an Arceo unanimity instruction, absent an election by the prosecution, is necessary: (1) at trial, the prosecution adduces proof of two or more separate and distinct culpable acts; and (2) the prosecution seeks to submit to the jury that only one offense was committed. Moreover, it bears repeating that the purpose of an Arceo unanimity instruction is to eliminate any ambiguity that might infect the jury's deliberations respecting the particular conduct in which the defendant is accused of engaging and that allegedly constitutes the charged offense.

Id. (emphasis added).

Here, the evidence adduced at trial was not marshalled by the prosecution to prove two or more "separate and distinct culpable acts," as the circumstantial evidence case asserted by the prosecution provided jurors with sufficient evidence from which to reasonably infer Brown's intentional or knowing act or omission causing Monsalve's death. As Brown correctly noted in his request to withdraw an Arceo instruction, the prosecution did not have to prove how Brown may have caused Monsalve's death, and "had there been direct evidence presented of multiple

66

acts by Mr. Brown, each of which could have conceivably caused Ms. Monsalve's death, an Arceo instruction would be appropriate. No such evidence was presented in this case."

We do not find the lack of a unanimity instruction was prejudicially insufficient, erroneous, inconsistent or misleading. See State v. Angei, 152 Hawai'i 484, 492, 526 P.3d 461, 469 (2023). We hold that an Arceo instruction was not required.

**2.    A lesser included offenses instruction pursuant to HRS § 701-709(5) was not required, as there was no rational basis in the evidence presented for a jury to acquit Brown on second-degree murder and convict him of reckless homicide.**

HRS § 701-109(4) provides, in relevant part, that an offense is "included" in another offense when:

    (a)  It is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

    (b)  It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

    (c)  It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

HRS § 701-109(4)(a)-(c).

As to a court's jury instructions on lesser included offenses, HRS § 701-109(5) provides, "The court is not obligated to charge the jury with respect to an included offense <u>unless</u> <u>there is a rational basis in the evidence for a verdict</u>

67

acquitting the defendant of the offense charged and convicting the defendant of the included offense."  HRS § 701-109(5) (emphasis added).

This court clarified in Angei that "[j]ury instructions on lesser-included offenses must be given where there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense."  152 Hawai'i at 495, 526 P.3d at 472 (cleaned up).

The trial court did not give an instruction on reckless manslaughter, and Brown's counsel withdrew his request for such an instruction stating, "there is no rational basis for acquitting Mr. Brown of murder and convicting him of reckless manslaughter."

Upon a review of the trial evidence, there was no rational basis for the jury to acquit Brown of second-degree murder and convict him of a lesser offense.  Thus we hold that the trial court did not err in not so instructing the jury.[12]

**F.    The circuit court did not err in denying Brown's motion to dismiss the 2020 indictment for insufficient charging language.**

Brown argues that the circuit court committed plain error in not dismissing the 2020 indictment for insufficient

---

[12]    At oral argument, Brown's counsel presented a scenario that may have supported a finding of recklessness or negligence.  However, this sua sponte offering of a fictional scenario that may have occurred was never presented to the jury, nor was it supported by evidence adduced at trial or in pre-trial hearings.

specificity in charging the voluntary act or omission allegedly performed by Brown. Specifically, Brown asserts that the indictment failed to state an offense, as it lacked adequate detail of the time, place, and circumstances of defendant's alleged actions to bring those alleged actions "within the statutory definition of the offense charged, to show that the court has jurisdiction, and to give the accused reasonable notice of the facts."

The prosecution counters that the substance of the 2020 indictment of Brown for second-degree murder was sufficient pursuant to the Motta/Wells standard, "under which the reviewing court liberally construes charges challenged for the first time on appeal." The prosecution further contends that there is a presumption of validity of the charge when trial has concluded with a conviction; and that a conviction cannot be reversed based on a defective indictment unless the defendant shows prejudice or that the indictment could not within reason be construed to charge a crime. See State v. Wheeler, 121 Hawaiʻi 383, 399, 219 P.3d 1170, 1186 (2009).

The question of whether a charge sets forth all the essential elements of a charged offense is a question of law reviewed de novo under the right/wrong standard. Jardine, 151 Hawaiʻi at 100, 508 P.3d at 1185; Wheeler, 121 Hawaiʻi at 390, 219 P.3d at 1177. We agree with the prosecution and hold the

circuit court did not plainly err in allowing the 2020 indictment to stand.  And since Brown raises this issue for the first time on appeal, we apply the Motta/Wells rule and liberally construe the charges as required when a criminal defendant brings an untimely challenge to the sufficiency of a charge.  State v. Motta, 66 Haw. 89, 90, 657 P.2d 1019, 1019 (1983); State v. Wells, 78 Hawai'i 373, 382, 894 P.2d 70, 78 (1995).  Under this rule, there is a presumption of validity and a conviction will not be reversed upon a defective indictment unless (1) defendant was prejudiced; or (2) the indictment cannot reasonably be construed to charge a crime.  Wheeler, 121 Hawai'i at 399-400, 219 P.3d at 1186-87 (cleaned up).

A charging document is not defective if it includes all the essential elements of the crime charged and relevant statutory definitions; and the defendant fails to show they were prejudiced by the charge.  Jardine, 151 Hawai'i at 100, 508 P.3d at 1186.  Here, the prosecution charged Brown with murder in the second degree pursuant to HRS § 707-701.5.  The indictment stated:

> That during or about the period of January 12, 2014, through January 13, 2014, inclusive, in the County of Maui, State of Hawaii, BERNARD BROWN did intentionally or knowingly cause the death of another person, to wit, Moreira Monsalve, thereby committing the offense of Murder in the Second Degree in violation of Section § 707-701.5 and subject to Section § 706-656 of the Hawaii Revised Statutes.

The indictment clearly indicates the time, place, and

circumstances necessary to bring "the transaction" involving defendant within the statutory definition of the offense changed.  The prosecution alleged Brown's murder of Monsalve happened during January 12-13, 2014, in the County of Maui, where, Brown intentionally or knowingly caused the death of Monsalve in violation of HRS § 707-701.5, subject to HRS § 706-656.

In State v. Aganon, this court clarified the elements for murder in the second degree, including the requisite state of mind and voluntary act.  97 Hawaiʻi 299, 36 P.3d 1269 (2001).  Pursuant to HRS § 702-205 (1993), the elements of the offense are:

> such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:
>
> (a) Are specified by the definition of the offense, and
>
> (b) Negative a defense (other than a defense based on the statute of limitations, lack of venue, or lack of jurisdiction).

HRS § 702-205.  We also noted that "not all offenses . . . have all three possible elements."  Aganon, 97 Hawaiʻi at 303, 36 P.3d at 1273.  Rather, "the totality of these various items--the proscribed conduct, attendant circumstances, and the specified result of conduct, when specified by the definition of the offense, constitute the 'elements' of an offense.  Id. (citing HRS § 702-205).

With regard to murder in the second degree (HRS § 707-

71

701.5),

> a person commits the offense of murder in the second degree when the "person <u>intentionally or knowingly</u> causes the death of another person." <u>Any voluntary act (e.g., physical abuse) or omission may satisfy the conduct element of the offense</u>. The <u>death of another person, as the intentional or knowing result of the conduct, constitutes the result element</u> of the offense.

Id. (emphases added). Pursuant to HRS § 702-204, a person is not guilty of an offense unless that person acted with the requisite state of mind with respect to each element of the offense. Id. at 302, 36 P.3d at 1272.

Brown argues that the indictment does not detail the "transaction" that took place between Monsalve and Brown to make that act or omission murder in the second degree rather than reckless manslaughter, negligent homicide, assault, or no criminal act. That is to say, Brown is contending the indictment was required to set forth the exact manner and cause of Monsalve's death. Without sufficient detail, Brown contends he did not have reasonable notice of the facts against him or of the voluntary act or omission that the prosecution would rely upon at trial to establish the conduct element of second-degree murder.

The prosecution asserts that with regard to a second-degree murder charge, the requirement is that the prosecution prove the defendant "intentionally or knowingly cause[d] the death of another person." Thus, any voluntary act or omission may

72

satisfy the conduct element of the offense, which is "causing the death of another person[.]" Nor "is there a requirement that the prosecution allege or prove a specific manner in which said death was caused."

In denying Brown's motion to dismiss the 2020 indictment, the circuit court rightly noted that the prosecution was not required to establish probable cause regarding the manner or cause of death. The court explained, "[w]hen drawing every legitimate inference in favor of the indictment here, it is clear that a person of ordinary caution or prudence could be led to believe that the defendant intentionally or knowingly caused the death of [Monsalve]." The court further noted that the

> [e]vidence presented to the grand jury detailed Ms. Monsalve's everyday life, routines, finances, professional career, future plans, amongst other things. The evidence presented demonstrated that all of these things came to an abrupt stop after the evening of January 12, 2014. Neither her children, Ms. Monsalve's friends or coworkers ever heard or saw Ms. Monsalve again.

The circuit court also pointed to the evidence presented to the grand jury that "further demonstrated that the defendant's statements about what took place on January 12, 2014 were often inconsistent with each other and inconsistent with other evidence presented by the State to the grand jury."

Under the facts and circumstances of this case, the trial court did not err given that the charging language includes all the essential elements of the crime charged, it can reasonably

73

be construed to charge a crime, and Brown has not shown any prejudice.

**G.    The circuit court did not err in denying Brown's motion for dismissal for alleged pre-indictment delay because Brown did not show presumptive or actual substantial prejudice.**

Brown asserts that the circuit court erred in not dismissing the case for pre-indictment delay.  The prosecution contends that Brown did not preserve this issue on appeal and thus waived it; but even if he had preserved it, Brown failed to meet his burden of showing actual substantial prejudice pursuant to our case law.

In State v. Higa, this court reiterated that

> [w]hen a defendant alleges a violation of due process based on a preindictment delay, the court must employ a balancing test, considering actual substantial prejudice to the defendant against the reasons asserted for the delay. Although the court ultimately weighs these considerations, it is the defendant's burden to initially establish that he or she has suffered actual substantial prejudice resulting from the delay.

102 Hawai'i at 187, 74 P.3d at 10 (citations omitted).

Brown asks this court to "revisit" Higa's requirement that the defendant establish actual, substantial prejudice.  Brown presents no cogent reasons to depart or diverge from our well-established balancing-test analysis.

On appeal, it is the defendant's burden to establish they have suffered actual substantial prejudice resulting from the delay; if they cannot, the inquiry ends.  Higa, 102 Hawai'i at 187, 74 P.3d at 10.  In a claim of pre-indictment delay, "the

proof must be definite and not speculative in order to establish prejudice." Keliiheleua, 105 Hawai'i at 180, 95 P.3d at 611 (citation omitted). In Keliiheleua, we held that the defendant's pre-indictment delay "did not affect his ability to present a defense at a trial of [the negligent injury] charge and, therefore, did not substantially prejudice his right to a fair trial." Id. And in State v. Levi, we rejected the claim that a thirty-one-month delay (two and a half years) would cause obvious memory loss and that such memory loss would meet the burden for presumed prejudice. 67 Haw. 247, 249, 686 P.2d 9, 10-11 (1984).

Here, Brown has not offered any evidence to support a finding that he suffered actual substantial prejudice in his defense because of the time lapse from 2014 to 2019, when he was first indicted. The five-year span from Monsalve's disappearance to the first indictment is longer than the two-and-a-half-year period, which we rejected as presumptively prejudicial in Levi. But as the circuit court noted in its assessment of whether Brown's due process rights were violated, "Although there [were] some changes or change in the way Mr. Brown responded to the questions, [the court could not] attribute that any more to a memory loss than you just have different answers."

This was a no-corpse murder case, relying entirely on

circumstantial evidence. And the time between Monsalve's disappearance and Brown's indictment was arguably needed by investigators and the prosecution to establish probable cause for second-degree murder. We take judicial notice that HRS § 560:1-107(5) (2018) provides in relevant part for probate and administrative purposes,

> An individual . . . who is absent for a continuous period of five years, during which the individual has not been heard from, and whose absence is not satisfactorily explained after diligent search or inquiry, is presumed to be dead. The individual's death is presumed to have occurred at the end of the period unless there is sufficient evidence for determining that death occurred earlier[.]

HRS § 560:1-107(5). While not evidentiary for the element of Monsalve's death, the record here reflects a death certificate was issued for Monsalve in 2019. In September 2019, the prosecution convened the first grand jury.

Balancing Brown's unsupported and conclusory claim of substantial prejudice from fading memories with the circumstances of this no-corpse case, the record does not demonstrate any undue delay on the part of MPD and the prosecutors or actual substantial prejudice to Brown. We therefore hold that the circuit court did not err in denying Brown's motion to dismiss for alleged pre-indictment delay.

**H.  The circuit court did not err when it denied Brown's motion to dismiss the 2020 indictment.**

Brown makes several claims of error arising from the second

grand jury proceedings in 2020: (1) that the circuit court erred in not dismissing the indictment because the prosecution adduced excessive hearsay testimony and the witnesses offered improper victim impact testimony; (2) that the prior dismissal of the 2019 grand jury indictment without prejudice required the prosecution to present new evidence to the 2020 grand jury; and (3) that the case presented to the grand jury lacked sufficient evidence to establish probable cause to indict Brown for second-degree murder of Monsalve.

The prosecution asserts that Brown's arguments are "moot and meritless." We agree.

The circuit court did not abuse its discretion in denying Brown's motion to dismiss the 2020 indictment on procedural grounds, and upon de novo review of the evidence presented to the grand jury, sufficient evidence was brought forward to support a finding of probable cause to charge Brown.

1. **The 2020 grand jury proceedings were not procedurally deficient or tainted by prosecutorial misconduct.**

   a. **Grand jury witnesses did not present excessive hearsay evidence as witnesses were unavailable and any hearsay evidence was not offered to better the prosecution's case.**

Hearsay is appropriate and allowed in grand jury proceedings. In State v. Murphy, we held that when a defendant moves for dismissal of the indictment based on hearsay evidence,

> [t]he preferable practice would be, of course, for the

77

> prosecution to present witnesses who are able to testify from first-hand knowledge whenever possible.  Nevertheless, **where the hearsay testimony was not used deliberately in the place of better evidence to improve the case for an indictment**, dismissal of the indictment is not required.

59 Haw. 1, 6, 575 P.2d 448, 453 (footnote omitted) (emphasis added).  See also State v. Layton, 53 Haw. 513, 515, 497 P.2d 559, 561 (1972) (holding it is a "policy expression and not . . . a hard and fast rule" that "hearsay evidence should only be used when direct testimony is unavailable or when it is demonstrably inconvenient to summon witnesses able to testify to facts from personal knowledge" (cleaned up).).

In his motion to dismiss the 2020 indictment, Brown claimed that Monsalve's daughter offered inadmissible hearsay statements about Monsalve's personal history, good character and assessments from Monsalve's employer.  Upon review of the transcript of the December 18, 2020 grand jury proceeding, it is unclear where Monsalve's daughter offers this alleged hearsay testimony, nor does Brown offer record citations in support of his contentions in his appellate briefs.

In his opening brief, Brown also asserts that the prosecution "laundered" the testimony of two witnesses, whom Brown respectively characterizes as a "homeless" man and "a felon," by having MPD officers testify about what these two witnesses would testify about at trial.  By implication, Brown asserts that these witnesses' identities lessened their

credibility, and thus required police to testify about what they would say in order to better the prosecution's case before the grand jury. But Brown overlooks that the testifying detective clearly stated that both trial witnesses were unavailable or unable to attend the grand jury the day of the proceeding.

On this record, we cannot conclude there was "laundering" of the prosecution's case through the grand jury witnesses' testimony. Further, Brown's claim of excessive hearsay testimony before the grand jury lacks specificity, other than naming every single person interviewed by the testifying police investigators, without regard to whether each person was unavailable or not. Thus, we hold that the trial court did not err in denying Brown's motion to dismiss the 2020 indictment on this basis.

**b.  Grand jury witnesses did not present improper victim impact testimony, as a victim's habits, routines, and family and community ties is relevant in establishing probable cause in a no-corpse homicide case.**

Brown asserts that the prosecution improperly elicited "victim impact" testimony from grand jury witnesses, which he raises as plain error. The prosecution counters that this testimony was relevant to the grand jury's determination of probable cause because such testimony "was necessary to show that [Monsalve] loved [her youngest son] and would not leave him without a trace."

In State v. Riveira, we defined "victim impact" evidence as relating to a crime's effect on the person harmed by the crime or others, including family members, and noted that during trial, as distinguished from the sentencing context, "a crime's after-effects are rarely allowed." 149 Hawai'i 427, 431, 494 P.3d 1160, 1164 (2021). In a burglary case in which the victim testified about how the crime made her feel, we determined that the prosecution had "infused the irrelevant impact evidence into its case" to prejudicial effect. Id. at 433, 494 P.3d at 1166.

In State v. Lora, a sexual assault case, the prosecution asked the complaining witness, "What was it like [after the assault] to be examined by a male doctor?" 147 Hawai'i 298, 307, 465 P.3d 745, 754 (2020). We held that "the detailed testimony about the physical examination was improperly admitted by the court" for lack of relevance to the crime. Id. at 308, 465 P.3d at 756.

The grand jury testimony Brown challenges in this case does not mirror Riveira or Lora. Here, given the no-corpse context of the case, the prosecution had the burden of establishing Monsalve's death based on the abruptness of her disappearance, and what her activities and values were, such that her complete silence and sudden absence from the lives of her children and friends and from her job and responsibilities did not comport with her lifestyle, routines and habits, prior to her

disappearance. See Torres I, 122 Hawai'i at 14, 222 P.3d at 421.

The grand jury witnesses presented details of Monsalve's personal relationships, especially with her daughter and youngest son, as well as her family and work habits, routines, aspirations, and plans for events in 2014--including celebrating her son's graduation and transition to college--which came to a complete and sudden stop without any warning after January 12, 2014. Testimony about Monsalve leaving loving motherly notes for her son were relevant to showing the strong bonds she had with her children, such that she would not leave them without any contact whatsoever for all the years since her disappearance.

We conclude that there was no prosecutorial misconduct in the presentation of grand jury testimony.

> **2.      The circuit court did not err in denying Brown's motion to dismiss the 2020 indictment, as the 2019 indictment was dismissed on procedural and not evidentiary grounds.**

Brown alleges that the circuit court erred in not dismissing his 2020 indictment with prejudice because the prosecution "re-shopped the same case it had presented to the 2019 grand jury," which was dismissed without prejudice. He asserts that the trial court presiding over his first prosecution dismissed the indictment for lack of probable cause.

We note that both matters arising from the 2019 and 2020

81

indictments were presided over by the same judge.  The order

dismissing the 2019 indictment without prejudice did not specify

the reasons or grounds for dismissal.  However, during the

hearings on Brown's motion to dismiss the 2020 indictment, the

circuit court noted:

> I remember distinctly grand jury counsel when asked, you know, well, what are we supposed to do here?  He said you're supposed to find probable cause.  Well, number one, it's an incorrect statement of the law, and secondly, grand jury counsel shouldn't be giving a, quote unquote, jury instruction to the jury.  You just explain the law.  Grand jury is not to find probable cause.  It's to determine whether the State has established with sufficient evidence probable cause.  It's a very big standard, and that alone was a significant thing.

(Emphasis added.)

In denying Brown's motion, the circuit court further noted

"a drastic difference between this grand jury proceeding and the

prior one [being] the comments by grand jury counsel in the

prior matter[,]" where "counsel unintentionally misspoke, he

provided the grand jurors with an erroneous statement of the

law."

On this basis, we find that the circuit court did not err

in declining to dismiss the 2020 indictment with prejudice.

3. **The 2020 grand jury had sufficient evidence of probable cause to indict Brown for the second-degree murder of Monsalve.**

In reviewing the sufficiency of the evidence to establish

probable cause in the second grand jury proceedings, every

legitimate inference that may be drawn from the evidence must be

drawn in favor of the indictment and neither the trial court nor the appellate court on review may substitute its judgment as to the weight of the evidence for that of the grand jury. Shaw, 150 Hawai'i at 61, 497 P.3d at 76.

Here, in denying Brown's motion to dismiss the 2020 indictment, the circuit court concluded:

> [COL] 10. Probable cause is established by the presentment of facts that would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused. The State has met this threshold.

Upon review of the 2020 grand jury proceedings, and the circuit court's findings and conclusions, we hold there was sufficient evidence presented to the 2020 grand jury under a probable cause standard to indict Brown for murder in the second degree of Monsalve.

## V. CONCLUSION

Accordingly, we affirm the circuit court's January 26, 2023 Judgment of Conviction and Sentence.

| | |
|---|---|
| Randall K. Hironaka<br>for Defendant-Appellant | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| Chad Kumagai<br>for Plaintiff-Appellee | /s/ Todd W. Eddins |
| | |
| David Van Acker<br>for Amicus Curiae | /s/ Lisa M. Ginoza |
| Attorney General of<br>the State of Hawai'i | /s/ Vladimir P. Devens |

